**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GARRISON SYSTEMS, LLC,

    Plaintiff,

v.                                   Case No.: 8:26-cv-____-___-___

HYDRO DAM LLC,

    Defendant.

_____/

## **COMPLAINT**

Plaintiff, Garrison Systems, LLC ("Garrison"), brings this complaint against Defendant, Hydro Dam LLC, for copyright infringement, deceptive acts and unfair trade practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), unfair competition and trademark infringement under the Lanham Act, common law trademark and service mark infringement, unjust enrichment, and breach of contract.  Plaintiff alleges as follows:

### **NATURE OF THE ACTION**

1. This is an action for injunctive and monetary relief arising from Defendant's copyright infringement, deceptive acts and unfair trade practices, unfair competition, trademark infringement, unjust enrichment, and breach of contract.

2. Plaintiff Garrison and Defendant compete in the same industry and geographic market selling and installing flood control systems.  Garrison has served

that market for decades; Defendant started in 2025.  Unlike Defendant, Garrison also designs and manufactures its own high-quality flood control systems.

3.    Garrison's website contains dozens of copyrighted images of its products and services and detailed promotional and educational materials.  Garrison proudly displays examples of completed installations of its products in various circumstances and settings.  Through that content, Garrison showcases its superior products and superior engineering, construction, and installation knowledge, skill, and experience that have earned over many years the goodwill and trust of the marketplace.  Garrison's website also contains terms of service where visitors agree not to copy or use any images or materials on the website without permission or for impermissible purposes.

4.    Defendant did precisely that when it unlawfully copied and used without permission Garrison's website images and materials, including Garrison's images showing completed installations in various circumstances, descriptions of Garrison's flood control systems, and Garrison's technical product design drawings. Defendant unlawfully published to the consuming public Garrison's images and materials as its own, thereby misleading the consuming public into believing that Garrison's images and materials reflected Defendant's own superior products and superior engineering and construction knowledge and skill derived from extensive experience installing effective flood control systems.  In truth, Defendant was an

2

inexperienced newcomer to this marketplace offering cheap and lesser quality flood control products and with little or no experience engineering, constructing, and installing flood control products in different circumstances and settings.

5.    Said another way, Defendant's misappropriations of Garrison's website materials and images misled the consuming public concerning Defendant's lack of engineering, construction, and installation knowledge, skill, and experience, as well as the inferior quality of its flood control products. As a result and as Defendant intended, the consuming public purchased Defendant's products and services, and at higher prices, than would have been the case had the truth been known—that Defendant is a newcomer to this marketplace selling inferior products and installation services.

6.    Garrison brings this action to enforce its rights to its intellectual property, to prevent Defendant's unfair competition and deceptive trade practices, and to enforce the agreement in its website's terms of service. Garrison seeks injunctive relief, damages, and to divest Defendant of its unjust profits.

## PARTIES

7.    Plaintiff Garrison Systems, LLC is a limited liability company organized under the laws of New York, with its principal place of business at 6601 Lyons Road, Unit F6-7, Coconut Creek, Florida 33073.

8.     Defendant Hydro Dam LLC ("Hydro Dam") is a limited liability company organized under the laws of Florida, with its principal place of business at 6140 Ulmerton Road, Clearwater, Florida 33760.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over Garrison's Lanham Act and copyright infringement claims under 28 U.S.C. §§ 1331, 1338(a) and 15 U.S.C. § 1121(a).

10.     The Court has supplemental jurisdiction over Garrison's state-law claims under 28 U.S.C. § 1367(a), because those state-law claims share a common nucleus of operative fact with Garrison's claims under the Copyright Act and Lanham Act.

11.     The Court also has supplemental jurisdiction over Garrison's state-law claims for unfair and deceptive trade practices under 28 U.S.C. § 1338(b), because those state-law claims are joined with substantial and related claims under the Copyright Act and Lanham Act.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b), because Defendant resides in Pinellas County, Florida and because a substantial part of the events giving rise to the claims occurred in Pinellas County, Florida.

13. This Court has personal jurisdiction over Defendant, because its principal place of business is in the State of Florida, and Defendant's conduct giving rise to this lawsuit occurred there.

## FACTUAL ALLEGATIONS

### Plaintiff Garrison's Business Model and Website

14. For years, Garrison has operated in the flood control market. Garrison has sold and installed its flood control products for use in thousands of homes, commercial properties, and government facilities.

15. Garrison operates throughout the United States and Canada, with offices and warehouses in Florida, California, and New York.

16. Garrison designs and manufactures a variety of flood control systems to help government agencies, businesses, and homeowners protect their property and equipment against flood damage.

17. In addition to manufacturing and selling flood control products, Garrison also engineers, constructs, and installs flood control solutions particular to each individual customer's needs and circumstances at each location.

18. Garrison's engineering services include expert analysis of each customer's flood vulnerability and recommended effective flood control products and types of installations of those products.

19.     Proper installation of effective flood control products requires, among other things, engineering, construction, and installation knowledge, experience, and expertise to design, measure, layout, align, affix, seal, and anchor appropriate flood control products to the customer's specific structures or surrounding areas.  Garrison experts must properly assess in each customer's circumstance, among other things, the anticipated water height, pressure, and weight on the flood barriers, the corresponding necessary length and height of flood barriers and their layout, the corresponding necessary type and amount of support required for the flood barriers, and the proper means and methods of affixing and anchoring the flood barriers. Improper engineering or installation can lead to failure of the flood control system and result in severe damage in the event of flood conditions.

20.     Garrison acquired its specialized product designs, manufacturing expertise, and engineering, construction, and installation knowledge and skills through years of hands-on experience involving thousands of installations in various configurations, circumstances, and conditions.

21.     At all times relevant to this lawsuit, Garrison used a website to sell its products and services, educate current and future customers, and showcase its knowledge, skill, experience, and expertise.

22.    Garrison owns all the content on its website, including the images, photographs, educational materials, trademarks, trade names, and the website's design.

23.    All content on Garrison's website was created by Garrison, is creative and unique in the marketplace, and has obvious proprietary value.

24.    On its website, Garrison strategically and carefully curated images and photographs of its products and completed installations in different configurations and circumstances to demonstrate, among other things, Garrison's superior knowledge, skill, experience, expertise, and products and services.

25.    At all times relevant to this lawsuit, Garrison's website, on the "Terms of Service & Sale" page, said that "by visiting our site . . . you engage in our 'Service' or with our 'Product' and agree to be bound by the following terms and conditions."

26.    A term in Section 2 stated, "You agree not to reproduce, duplicate, copy, sell, resell, or exploit any portion of the Website, Service, use of the Service, or access to the Service or any content on the website through which the Service is provided, without express written permission by us."

27.    A term in Section 13 prohibited a website visitor "from using the site or its content: (a) for any unlawful purpose; (b) to solicit others to perform or participate in unlawful acts; (c) to violate any . . . federal . . . or state regulations,

7

rules, laws, or local ordinances; (d) to infringe upon or violate our intellectual property rights . . .; [or] (f) to submit false or misleading information."

28. At all times relevant to this lawsuit, Garrison's website displayed an underlined hyperlink to the above Terms of Service & Sale on the bottom of every page.

### Garrison's Valuable Intellectual Property Rights

29. Garrison invested resources, including time, effort, talent, creativity, and money, to produce photographs and creative content on its website to reflect its superior products, knowledge, skill, experience, and expertise to consumers seeking flood control products.

30. Each image and piece of work product on Garrison's website is a separate copyrighted work.

31. Garrison holds the copyrights for the pictures and work product depicting flood control products and services that Garrison published on its website.

32. Starting in October 2025, Garrison filed copyright registration applications for many of the images and designs that it displayed on its website.

33. In February and March 2026, the Copyright Office approved registrations of several of Garrison's images that are the subject of this litigation (collectively, the "Works"). Copies of those Certificates of Registration are attached to this Complaint as **Composite Exhibit A**.

8

34.    Garrison reserves the right to add further registered images and work product to this Complaint if and when the Copyright Office issues additional registrations to Garrison.

35.    Among the Works are the following images:

36.    *Registration No. VA2-483-813*.    This copyrighted image depicts a Garrison double-post product:



37.    *Registration No. VA2-483-812.* This copyrighted image depicts a Garrison corner-post product:



38.    *Registration Nos. VA2-483-806 (Inside Mount Post (L/R)), VA2-486-146 (Drop In Anchor Bolt), VA2-487-297 (Center Post Kicker Leg), VA2-487-300 (Post Kicker Baseplate)*: This graphic contains several copyrighted images, in

10

addition to the above, of Garrison's system components:[1]



---

[1] Red boxes have been applied to this image to highlight the additional images subject to copyright registration in this graphic.

39. *Registration No. VA2-483-795*. This copyrighted image depicts a Garrison center-post product:



40. *Registration No. VA2-487-290*. This copyrighted image depicts a proprietary illustration of how Garrison's aluminum flood barrier system mounts outside of an opening:



41. Over several decades, Garrison has also invested resources, including time, effort, talent, creativity, and money, to develop trademarks that serve to represent to the consuming public Garrison's superior knowledge, skill, experience, expertise, and products and services.

42. As a result of Garrison's significant promotion and advertising efforts, Garrison has accumulated considerable goodwill and recognition in its trademarks, and has developed strong common law rights in its marks.

43. Consumers have come to associate Garrison's marks with Garrison and its superior knowledge, skill, experience, expertise, and products and services.

44. Garrison started using the mark "HAMMERHEAD ALUMINUM FLOOD PLANKS" in August 2022 and has used that mark continually since then to market its goods and services related to "flood control devices namely, metal barriers for flood control."

45. On November 4, 2024, Garrison filed for registration its HAMMERHEAD ALUMINUM FLOOD PLANKS mark with the United States Patent and Trademark Office.

46. On October 28, 2025, the United States Patent and Trademark Office approved a registration to Garrison for the trademark, HAMMERHEAD ALUMINUM FLOOD PLANKS, Registration No. 7999962.  A copy of Garrison's Trademark Registration Certificate is attached as **Exhibit B**.

47.     Garrison has operated its branded website for several years and has continually operated a page dedicated to the goods and services associated with the HAMMERHEAD ALUMINUM FLOOD PLANKS mark since September 2022.

48.     Garrison has expended considerable resources, time, and effort to market goods and services associated with the HAMMERHEAD ALUMINUM FLOOD PLANKS mark, including in paid advertisements, in case studies released on Garrison's website, in podcast episodes available on Spotify, and in postings on YouTube, Facebook, and Instagram.

49.     As a result of Garrison's longstanding, widespread, and continuous use of the HAMMERHEAD ALUMINUM FLOOD PLANKS mark since August 2022, this mark has become uniquely associated with Garrison and has come to identify Garrison as the source of Garrison's goods and services.

50.     The HAMMERHEAD ALUMINUM FLOOD PLANKS mark has garnered widespread recognition with the consuming public.

**Defendant Misappropriates Garrison's Intellectual Property and Experience**

51.     Defendant was created in April 2025 to market, sell, and install flood control products that compete in the same market as Garrison's products and services.

14

52.    Defendant visited Garrison's website and, without the knowledge or permission of Garrison, copied and saved images, designs, work product, and other proprietary material from Garrison's website (including the Works).

53.    In addition and in the alternative, Defendant accessed Garrison's images and other website content (including the Works) by searching for images on Google or another similar search engine.

54.    In addition and in the alternative, Defendant knowingly received from one or more persons or entities Garrison's unlawfully copied images, photographs, designs, work product, and other proprietary material (including the Works).

55.    Defendant then without permission and without attribution presented the copied material (including the Works) as its own to the consuming public on Defendant's website and marketing media and materials.

56.    In addition and in the alternative, Defendant knowingly received from one or more persons or entities Garrison's unlawfully copied images, photographs, designs, work product, and other proprietary material (including the Works) and, with full knowledge that Defendant had no permission to do so, misleadingly and falsely published Garrison's stolen website images and materials (including the Works) on Defendant's website and marketing media and materials as Defendant's own, in order to market in a false and misleading manner the competing products and services of Defendant.

57.    Defendant sold lower quality flood control products different from the misappropriated Garrison work product, images, and materials (including the Works) presented on Defendant's website and marketing media and materials.

58.    Defendant's misappropriation was brazen and misled the consuming public concerning the actual products being sold.

59.    Defendant copied and misappropriated substantial portions of Garrison's website, including several of Garrison's graphics, and images of Garrison's products and completed installation projects (including the Works).

60.    Defendant also copied many of Garrison's marketing materials and instructional brochures from Garrison's website including: Garrison's Installation Instructions, Hammerhead Brochure, Components Brochure, storm preparation instructions and tips titled "How to Prepare in Advance of a Storm," Frequently Asked Questions, Operations and Maintenance Manual, the Hammerhead Specification Sheet, and other images, graphics, and written work.

61.    By misappropriating Garrison's images and other website materials (including the Works) and presenting them as Defendant's own, Defendant misled the consuming public into believing (i) that Defendant possessed more knowledge, skill, experience, and expertise than it actually did; (ii) that the depicted products and completed installations were Defendant's own; and (iii) that Defendant's goods and services were of comparable quality and efficacy to those depicted.

16

62.     As a result of its actions, Defendant misled the consuming public into purchasing Defendant's products and services, and purchasing those products and services at higher prices, than otherwise would have been the case.

### Examples of Defendant's Misappropriation against Garrison

63.     Defendant copied significant portions of Garrison's installation instructions.

64.     Defendant's Installation Instructions make multiple references to "Hammerhead" components.[2]

---

[2] A red box has been added to some of these screenshots in these examples to highlight particular instances of Defendant's misappropriation.

*Installation instructions on Defendant's website:*



65.    The following examples demonstrate further Defendant's willful misappropriation of Garrison's website content:

**66.    Example 1:**

*Proprietary images from the installation instructions on Garrison's website*:



*Images from the installation instructions on Defendant's website*:



19

**67.    Example 2:**

*Proprietary images from the installation instructions on Garrison's website*:

  

*Images from the installation instructions on Defendant's website*:

   

20

**68.    Example 3:**

*Garrison's Hammerhead brochure on Garrison's website*:

The Hammerhead™ aluminum panel flood barrier system is a durable flood barrier that enables you to protect doorways and other openings against flooding.

U-Channel posts are installed on either side of the opening to be protected. These unobtrusive posts remain in place permanently and when flooding is expected are designed to receive a series of aluminum planks, which are stacked as needed to the height required.

The Hammerhead™ stackable "stop log" flood barrier is able to withstand water up to 6 feet and will protect your building, residence, or facility against all types of flooding.

This flood gate system is also ideal for areas where high wind or debris is expected as the fixed posts and clamped planks are durable and rigid and designed to handle heavy stresses.


**Simple Installation**
Hammerhead™ plank system is designed to fit your specific entryways with minimal adjustments to your property. Once mounting posts are installed, planks are easily slid down to build your optimal height of protection.


**Durable Flood Protection**
Hammerhead™ panels are made from a durable 6063 T-6 Aluminum able to withstand heavy stress brought on by flood water.


**Rapid Deployment**
When a flood is expected, insert planks into the mounting posts on either side of the door opening and tighten down.


**12'+ Wide Width**
Hammerhead™ provides panel widths up to 12' wide without additional supports. Unlimited length is achieved with center posts for even more protection.

*Defendant's Hydro Dam brochure from Defendant's website*:

The Hydro Dam™ aluminum panel flood barrier system is a robust solution designed to protect doorways and other openings from flooding.

U-Channel posts are installed on both sides of the area to be secured. These low-profile posts remain permanently in place and are built to receive aluminum planks when flooding is anticipated.

The planks are stacked to the necessary height, forming a secure barrier.

The Hydro Dam™ stackable "stop log" system can withstand water depths of up to 6 feet, offering reliable protection for buildings, homes, or facilities against various types of flooding.

This flood barrier is also well-suited for environments prone to strong winds or floating debris, thanks to its fixed posts and tightly clamped aluminum planks that provide strength and stability under pressure.


**Simple Installation**
The Hydro Dam™ plank system is engineered to fit your specific entryways with minimal modifications to your property. Once the mounting posts are in place, the planks can be easily slid down to create your desired level of protection.


**Durable Flood Protection**
Hydro Dam™ panels are made from sturdy 6063 T-6 Aluminum, designed to resist the intense pressure caused by floodwaters.


**Rapid Deployment**
When flooding is anticipated, simply insert Hydro Dam planks into the mounting posts on both sides of the doorway and securely tighten them.


**12'+ Wide Width**
Hydro Dam™ offers panel widths up to 12' wide without the need for additional supports. For even greater protection, unlimited length can be achieved using center posts.

**69.    Example 4:**

*Image from Garrison's Hammerhead brochure:*

*Image from Defendant's Hydro Dam brochure:*





**70.     Example 5:**

*Proprietary images from Garrison's Hammerhead brochure on Garrison's website*:



*Images from Defendant's Hydro Dam brochure on Defendant's website*:



23

**71.    Example 6:**

*"How to Prepare in Advance of a Storm" instructions from Garrison's website*:



*"Storm Preparation Tips You Should Follow Early" from Defendant's website*:



24

**72.    Example 7:**

*"Frequently Asked Questions" brochure from Garrison's website:*

*"Customer Questions" brochure from Defendant's website:*

**How do I install the Hammerhead™ Aluminum Flood Barrier?**

Download the Hammerhead™ Installation Instructions **HERE**

**Are there any tools or resources needed when deploying the Hammerhead™ Barrier?**

For initial installation and to attach support posts to either side of the opening to be protected, have a hammer drill ready to drill the necessary holes for the expanding mounting bolts.

When installing planks in advance of a flood, use our included Allen wrench to tighten down planks and to secure the upper locking plate.

**What is the Hammerhead™ Flood Barrier made out of?**

The Hammerhead™ aluminum flood barrier is manufactured using high quality extruded 6063 T-6 Aluminum planks and posts and casted fitting. Hardware is made from stainless steel. Components are designed to be durable as well as weather and rust resistant.

**How is a seal created with the ground?**

The lower Hammerhead™ flood plank has rubber EPDM seal, which creates a strong seal with the ground below. Some consideration should be given to uneven ground surfaces as the plank is inflexible and while there is some flexibility to the EPDM seal, the ground should be patched and relatively level to achieve a good seal off.

Additional planks also have a closed cell rubber seal to create a seal between planks.

**What level of water can these panels protect against?**

The Hammerhead™ aluminum flood barrier can handle floods up to 6ft, with each plank measuring just under 7.5" in height.

Order barriers with the number of planks you need to achieve the protection height you need for your specific scenario. Standard recommended size is 5 planks or 3.07ft.

**How do I install the Hydro Dam™ Aluminum Flood Barrier?**

Download the Hydro Dam™ Installation Instructions HERE.

**Are any tools or additional resources needed when deploying the Hydro Dam™ Barrier?**

For the initial setup and to secure the support posts on either side of the area to be protected, you will need a hammer drill to create the necessary holes for the expansion bolts.

When installing the planks before a potential flood, use the included Allen wrench to tighten them into place and secure the upper locking plate.

**What materials are used to manufacture the Hydro Dam™ Flood Barrier?**

The Hydro Dam™ aluminum flood barrier is made from high-quality extruded 6063 T-6 aluminum planks and posts, with cast aluminum fittings. All hardware is stainless steel, ensuring durability and resistance to weather and corrosion.

**How is the seal formed with the ground?**

The bottom Hydro Dam™ flood plank features an EPDM rubber seal that creates a strong seal with the ground. Since the plank itself is rigid some ground leveling may be necessary to ensure proper contact—especially on uneven surfaces. Additional planks include closed-cell rubber seals to ensure a watertight connection between each layer.

**What level of flooding can the Hydro Dam™ panels protect against?**

Hydro Dam™ barriers can withstand floodwaters up to 6 feet. Each plank measures just under 7.5 inches in height. Order the number of planks required to reach your desired protection height. A standard configuration typically uses 5 planks, offering about 3.07 feet of protection.

25

### 73.     Example 8:

*Operations and Maintenance Manual*

*from Garrison's website:*

*Operations and Maintenance Guide*

*from Defendant's website:*

#### Hammerhead™ Product Information

**Please Note:** *This manual contains information regarding the operation and maintenance of the custom fabricated Hammerhead Aluminum Flood Plank System. The effectiveness of this system depends on proper installation and operation. The operation and usage other than for what this product is intended for could result in damage or less than acceptable performance at the time of need, for which Garrison™ Flood Control will not be held responsible. Improper maintenance will affect performance. Unauthorized modifications to the Hammerhead Aluminum Flood Plank System without prior written consent and approval from Garrison Flood Control, will void the warranty.*

#### Operations

I.   Safety Precautions for handling Hammerhead Aluminum Flood Barrier Planks and accessories:
   - Wear appropriate personal protective equipment (PPE), including safety glasses, gloves, and sturdy shoes.
   - Inspect the planks before use for any signs of damage, such as dents, cracks, or bends. If any serious damage is found, take photos of the damaged plank and document.
   - Use proper lifting techniques when moving the planks. Bend at the knees and lift with your legs, not your back.
   - Be aware of your surroundings and avoid placing the planks near any electrical hazards, such as power lines.
   - If you are working with aluminum flood barrier planks in a cold or wet environment, be aware that the planks may become slippery. Take extra precautions to prevent slipping and falls.
   - If you are working with aluminum flood barrier planks in a windy environment, be aware that the wind may cause the planks to shift or blow over. Take extra precaution to secure the planks in place.
   - Always follow the manufacturer's instructions for handling and installing aluminum flood barrier planks.
   - Do not force planks or components if they do not operate freely. Check that all tensioning bolts are loosened prior to installation.
   - When dismantling Hammerhead flood barrier planks and components, protect all pieces and hardware.

#### Hydro Dam™ Product Information

**Attention**: This manual contains information regarding the operation and maintenance of the custom-fabricated Hydro Dam Aluminum Flood Barrier System. The effectiveness of this system depends on proper installation and operation. Use of the product outside of its intended purpose may result in damage or unsatisfactory performance at a time of need, for which Hydro Dam will not be held responsible.
Improper maintenance will affect performance. Any unauthorized modifications to the Hydro DamAluminum Flood Barrier System, without prior written consent from Hydro Dam, will void the warranty.

#### Operations
**I. Safety Guidelines for Handling Hydro Dam Aluminum Flood Barriers and Accessories:**
- Always wear proper personal protective equipment (PPE), such as safety goggles, gloves, and sturdy closed-toe shoes.
- Inspect the barriers before use for any signs of damage, such as dents, cracks, or deformation. If significant damage is found, take photos and document the issue.
- Use proper lifting techniques when handling the barriers: bend your knees and lift with your legs, not your back.
- Stay aware of your surroundings and avoid placing the barriers near electrical hazards, such as power lines.
- In cold or damp environments, be extra cautious—aluminum surfaces may become slippery.
- In windy conditions, ensure all barriers are securely fastened, as wind can cause them to shift or fall.
- Always follow the manufacturer's instructions for the safe handling and installation of the Hydro Dam flood barrier system.
- Do not force any planks or components if they do not move freely. Make sure all tension bolts are loosened prior to installation.
- When dismantling the Hydro Dam system, keep all parts and hardware protected to preserve their condition for future use.

**74.    Example 9:**

*Specification Sheet from Garrison's website:*



*Specification Sheet from Defendant's website:*



27

75.    Complete copies of Garrison's Installation Instructions and Defendant's Installation Instructions are attached as **Composite Exhibit C**.

76.    Complete copies of Garrison's Hammerhead brochure and Defendant's Hydro Dam brochure are attached as **Composite Exhibit D**.

77.    Complete copies of Garrison's Components brochure and Defendant's Components brochure are attached as **Composite Exhibit E**.

78.    Complete copies of Garrison's "How to Prepare in Advance of a Storm" instructions and Defendant's "Storm Preparation Tips You Should Follow Early" are attached as **Composite Exhibit F**.

79.    Complete copies of Garrison's "Frequently Asked Questions" brochure and Defendant's "Customer Questions" brochure are attached as **Composite Exhibit G**.

80.    Complete copies of Garrison's Operations and Maintenance Manual and Defendant's Operations and Maintenance Manual are attached as **Composite Exhibit H**.

81.    In addition to copying other aspects of Garrison's Operations and Maintenance Manual, Defendant also copied Garrison's Warranty Registration Form found at the end of the manual.

82.    Complete copies of Garrison's Specification Sheet and Defendant's Specification Sheet are attached as **Composite Exhibit I**.

28

83. Defendant's misconduct has caused and is causing Garrison to suffer damages and harm, including lost sales, lost licensing fees, loss of goodwill, harm to reputation, and other harms.

84. Moreover, Defendant has been unjustly enriched by deriving, among other things, misappropriated goodwill and reputation, increased sales, and higher profits by virtue of its misconduct.

85. This suit seeks among other things Garrison's damages, divestiture of Defendant's unjust enrichment, and an injunction stopping Defendant's unlawful conduct as set forth above and prohibiting Defendant from continuing such unlawful conduct.

86. Garrison has retained the law firm of Holland & Knight LLP for purposes of this action and has agreed to pay reasonable attorneys' fees.

## CLAIMS FOR RELIEF

### COUNT I
### Copyright Infringement
### (17 U.S.C. §§ 101, *et seq.*)

87. Garrison incorporates by reference the allegations set forth in paragraphs 1 through 86 above as if fully restated herein.

88. The Works described in paragraphs 36 through 40 and reflected in **Composite Exhibit A** are the subject of this copyright claim.

89. The Works are original works and copyrightable subject matter under the copyright laws of the United States.

90. Garrison is the owner of valid copyrights in the Works, and the Register of Copyrights has issued valid Certificates of Registration for the Works, as reflected in **Composite Exhibit A**.

91. Garrison has complied in all respects with 17 U.S.C. §§ 101, *et seq.*, and has secured the exclusive rights, title, and interest in and to all copyrights in each of the Works.

92. Defendant had access to the Works before Defendant commenced its acts of infringement by visiting Garrison's publicly available website or by obtaining copies through third parties who visited Garrison's website.

93. The infringing works presented to the consuming public by Defendant are strikingly similar to the Works owned by Garrison.

94. Defendant willfully and deliberately and without permission infringed Garrison's copyrights in violation of the Copyright Act, including by copying the protected components of the Works, by creating derivative works, as well as by publicly displaying, publishing, and distributing the Works on Defendant's website and marketing media and materials.

95. Defendant directly engaged in such willful and deliberate infringement of Garrison's copyrights, by instructing or directing one or more of its agents, while

acting in the scope of their agency and authority granted by Defendant, to take the infringing acts.

96.    In addition and in the alternative, Defendant had the right and ability to supervise and control the infringing acts of one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

97.    Defendant failed to stop the infringing acts of one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

98.    Defendant derived financial benefit from the infringing acts of one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

99.    The infringing works are virtually identical copies in terms of the protected portions of the Works, including choice of subject matter, lighting, shading, drawing style, and positioning and angle of the products.

100.    A comparison between the Works and the images used on Defendant's website and marketing media and materials makes those striking similarities apparent:

*Garrison's Copyrighted Image*:



*Defendant's Infringing Work*:



**Installing Hydro Dam Center or Corner Posts**
 Hydro Dam center posts are used for longer
These center posts come with a kicker leg wh
from flooding. Hydro Dam corner posts are us
protection.





*Garrison's Copyrighted Image*:



*Defendant's Infringing Work*:



*Garrison's Copyrighted Image*:                   *Defendant's Infringing Work*:

                              

*Garrison's Copyrighted Image*:                   *Defendant's Infringing Work*:

                              

33

*Garrison's Copyrighted Image*:    *Defendant's Infringing Work*:




*Garrison's Copyrighted Image*:    *Defendant's Infringing Work*:




34

*Garrison's Copyrighted Image*:



*Defendant's Infringing Work*:



*Garrison's Copyrighted Image*:



*Defendant's Infringing Work*:



35

*Garrison's Copyrighted Images:*          *Defendant's Infringing Works:*



101. In addition and in the alternative, the infringing works presented to the consuming public by Defendant are at least substantially similar to the Works owned by Garrison.

102. Defendant's infringing actions were taken without the consent or other permission of Garrison.

103. Defendant's infringing actions are the direct and proximate cause of damages and harm to Garrison, including lost sales, lost licensing fees, loss of goodwill, harm to reputation, and other harms.

104. Defendant has realized unjust profits and reputational gains and advantages because of its infringement. To the extent its infringement may have ceased, Defendant will still continue to realize unjust profits and reputational gains and advantages by having initially attracted and secured clientele through its infringement and thereafter wrongfully obtained corresponding increases in its goodwill and reputation in the marketplace, increases in its sales of products and services, and increases in its profits.

105. In addition and in the alternative, there is no adequate remedy at law, and Garrison is suffering and will continue to suffer irreparable injury in the absence of equitable relief prohibiting Defendant's unlawful conduct.

## COUNT II
### Trademark Infringement
### (15 U.S.C. § 1114(1))

106. Garrison incorporates by reference the allegations set forth in paragraphs 1 through 86 above as if fully restated herein.

107. 15 U.S.C. § 1114(1) prohibits the unauthorized, commercial use of registered trademarks and service marks in a manner that is likely to cause consumer confusion, mistake, or deception as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of their goods, services, or commercial activities by another person.

108. Garrison owns and has rights to use its federally registered mark, HAMMERHEAD ALUMINUM FLOOD PLANKS, in connection with "flood control devices namely, metal barriers for flood control."

109. Garrison's mark is distinctive for Garrison's goods and services, either through being inherently distinctive or acquiring secondary meaning.

110. Garrison's use in commerce and rights in the HAMMERHEAD ALUMINUM FLOOD PLANKS mark predates Defendant's use by at least 2 years.

111. Garrison's mark has priority by virtue of its registration of the HAMMERHEAD ALUMINUM FLOOD PLANKS mark with the United States Patent and Trademark Office, which was filed on November 4, 2024.

112. Defendant used a confusingly similar mark in connection with the sale, offering for sale, distribution, or advertising of Defendant's goods.

113. Defendant's infringing mark was identical to and substantially indistinguishable from Garrison's HAMMERHEAD ALUMINUM FLOOD PLANKS mark in sight, sound, and commercial impression.

114. While of lower quality, Defendant's goods and services are closely related to and substantially similar to the types of goods and services offered by Garrison.

115. Defendant and Garrison sell their products through similar outlets, namely their websites, and sell to similar types of consumers seeking flood control products for their homes and businesses.

116. Defendant's and Garrison's advertising media are substantially similar, in terms of using their websites and providing similar installation instructions, components brochures, storm preparation instructions and tips, operations and maintenance manual, and specification sheets.

117. Defendant chose to use a mark confusingly similar to Garrison's HAMMERHEAD ALUMINUM FLOOD PLANKS mark with constructive or actual knowledge of Garrison's prior use of and rights in the HAMMERHEAD ALUMINUM FLOOD PLANKS mark.

39

118. Defendant's use of a confusingly similar mark was done without the consent or other permission of Garrison.

119. Defendant's use of a confusingly similar mark deprived Garrison of the ability to control consumer perception of the quality of the goods marketed under the HAMMERHEAD ALUMINUM FLOOD PLANKS mark and placed Garrison's valuable reputation and goodwill in the hands of Defendant, over whom Garrison has no control.

120. Defendant's unauthorized use of a confusingly similar mark was likely to, and did, confuse, mislead, or deceive the consuming public to believe that Defendant was affiliated, connected, or associated with Garrison.

121. Defendant's unauthorized use of a confusingly similar mark was likely to, and did, confuse, mislead, or deceive the consuming public as to the origin, source, sponsorship, affiliation, or approval of Defendant's goods, services, or commercial activities, including those depicted on Defendant's website, by Garrison.

122. Defendant's unauthorized use of a confusingly similar mark was likely to, and did, confuse, mislead, or deceive the consuming public as to the nature, quality, and characteristics of Defendant's products, and Defendant's knowledge, skill, experience, and expertise assessing, engineering, constructing, and installing flood control products.

123. Defendant engaged in this trademark infringement through one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

124. Defendant's unlawful actions affected interstate commerce by causing a confusingly similar mark to be published on Defendant's website and marketing media and materials accessible to the consuming public, resulting in Defendant's goods entering interstate commerce.

125. Defendant's unlawful actions were willful.

126. Defendant's unlawful actions constitute trademark infringement and are a violation of 15 U.S.C. § 1114(1).

127. Defendant's unlawful actions are the direct and proximate cause of damages and harm to Garrison, including lost sales, lost licensing fees, loss of goodwill, harm to reputation, and other harms.

128. Defendant has realized unjust profits and reputational gains and advantages because of its unlawful actions. To the extent its unlawful actions may have ceased, Defendant will still continue to realize unjust profits and reputational gains and advantages by having initially attracted and secured clientele through its unlawful actions and thereafter wrongfully obtained corresponding increases in its goodwill and reputation in the marketplace, increases in its sales of products and services, and increases in its profits.

129. In addition and in the alternative, there is no adequate remedy at law, and Garrison is suffering and will continue to suffer irreparable injury in the absence of equitable relief prohibiting Defendant's unlawful conduct.

## COUNT III
### Common Law Trademark and Service Mark Infringement
### (Florida Common Law)

130. Garrison incorporates by reference the allegations set forth in paragraphs 1 through 86 above as if fully restated herein.

131. Garrison owns and has rights to use its federally registered mark, HAMMERHEAD ALUMINUM FLOOD PLANKS, in connection with "flood control devices namely, metal barriers for flood control."

132. Garrison's HAMMERHEAD ALUMINUM FLOOD PLANKS mark is a valid trademark and service mark under the common law.

133. Garrison's mark is distinctive for Garrison's goods and services, either through being inherently distinctive or acquiring secondary meaning.

134. Garrison's use in commerce and rights in the HAMMERHEAD ALUMINUM FLOOD PLANKS mark predates Defendant's use by at least 2 years.

135. Garrison's use of the HAMMERHEAD ALUMINUM FLOOD PLANKS mark gained distinctiveness before Defendant's first use of any confusingly similar mark, and gained such distinctiveness in the same geographic region in which Defendant operates in Florida.

42

136.   Defendant used a confusingly similar mark in connection with the sale, offering for sale, distribution, or advertising of Defendant's goods or services.

137.   Defendant's infringing mark was identical to and substantially indistinguishable from Garrison's HAMMERHEAD ALUMINUM FLOOD PLANKS mark in sight, sound, and commercial impression.

138.   While of lower quality, Defendant's goods and services are closely related to and substantially similar to the types of goods and services offered by Garrison.

139.   Defendant and Garrison sell their products through similar outlets, namely their websites, and sell to similar types of consumers seeking flood control products for their homes and businesses.

140.   Defendant's and Garrison's advertising media are substantially similar, in terms of using their websites and providing similar installation instructions, components brochures, storm preparation instructions and tips, operations and maintenance manual, and specification sheets.

141.   Defendant chose to use a mark confusingly similar to Garrison's HAMMERHEAD ALUMINUM FLOOD PLANKS mark with constructive or actual knowledge of Garrison's prior use of and rights in the HAMMERHEAD ALUMINUM FLOOD PLANKS mark.

43

142. Defendant's use of a confusingly similar mark was done without the consent or other permission of Garrison.

143. Defendant's use of a confusingly similar mark deprived Garrison of the ability to control consumer perception of the quality of the goods and services marketed under the HAMMERHEAD ALUMINUM FLOOD PLANKS mark and placed Garrison's valuable reputation and goodwill in the hands of Defendant, over whom Garrison has no control.

144. Defendant's unauthorized use of a confusingly similar mark was likely to, and did, confuse, mislead, or deceive the consuming public to believe that Defendant was affiliated, connected, or associated with Garrison.

145. Defendant's unauthorized use of a confusingly similar mark was likely to, and did, confuse, mislead, or deceive the consuming public as to the origin, source, sponsorship, affiliation, or approval of Defendant's goods, services, or commercial activities, including those depicted on Defendant's website, by Garrison.

146. Defendant's unauthorized use of a confusingly similar mark was likely to, and did, confuse, mislead, or deceive the consuming public as to the nature, quality, and characteristics of Defendant's products, and Defendant's knowledge, skill, experience, and expertise assessing, engineering, constructing, and installing flood control products.

147. Defendant engaged in this trademark and service mark infringement through one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

148. Defendant's unlawful actions affected interstate commerce by causing a confusingly similar mark to be published on Defendant's website and marketing media and materials accessible to the consuming public, resulting in Defendant's goods and services entering interstate commerce.

149. Defendant's unlawful actions were willful.

150. Defendant's unlawful actions constitute common law trademark and service mark infringement.

151. Defendant's unlawful actions are the direct and proximate cause of damages and harm to Garrison, including lost sales, lost licensing fees, loss of goodwill, harm to reputation, and other harms.

152. Defendant has realized unjust profits and reputational gains and advantages because of its unlawful actions. To the extent its unlawful actions may have ceased, Defendant will still continue to realize unjust profits and reputational gains and advantages by having initially attracted and secured clientele through its unlawful actions and thereafter wrongfully obtained corresponding increases in its goodwill and reputation in the marketplace, increases in its sales of products and services, and increases in its profits.

153. In addition and in the alternative, there is no adequate remedy at law, and Garrison is suffering and will continue to suffer irreparable injury in the absence of equitable relief prohibiting Defendant's unlawful conduct.

**<u>COUNT IV</u>**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**(FDUTPA, Fla. Stat. §§ 501.201, *et seq*.)**

154. Garrison incorporates by reference the allegations set forth in paragraphs 1 through 86 above as if fully restated herein.

155. FDUTPA prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts in the conduct of any trade or commerce. FDUTPA protects legitimate business enterprises, like Garrison, from those who engage in unfair methods of competition.

156. Defendant engaged in deceptive acts and unfair trade practices by misappropriating Garrison's images and other website content and presenting them as Defendant's own, as well as using Garrison's HAMMERHEAD ALUMINUM FLOOD PLANKS mark.

157. Defendant engaged in these deceptive acts and unfair trade practices through one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

158. Defendant's deceptive acts and unfair trade practices were likely to, and did, mislead or deceive the consuming public to believe that Defendant sold,

46

designed, engineered, and installed the shown products and completed installation projects, when in fact the shown products and completed installation projects were Garrison's.

159. Defendant's unauthorized uses of Garrison's images and other website content were likely to, and did, mislead or deceive the consuming public as to the nature, quality, and characteristics of Defendant's products, and Defendant's knowledge, skill, experience, and expertise assessing, engineering, constructing, and installing flood control products.

160. Defendant's unauthorized uses of Garrison's images and other website content were likely to, and did, mislead or deceive the consuming public as to the origin, source, sponsorship, or affiliation of the products and services depicted in the content and the products and services of Defendant.

161. Defendant's unlawful actions harmed both the consuming public and Garrison, including by inducing consumers to purchase products and services from Defendant and at higher prices than would have occurred had the truth been known.

162. Defendant's unlawful actions were conducted with the intent to induce others to rely upon such deceptive and unfair acts and practices, in order to mislead or deceive the consuming public and thereby gain an increase in sales, a larger customer base, increases in its goodwill and reputation in the marketplace, and higher prices.

163. Defendant's unlawful actions constitute willfully unfair and deceptive conduct in violation of FDUTPA, §§ 501.201, *et seq.*, Florida Statutes.

164. Defendant's unlawful actions are the direct and proximate cause of damages and harm to Garrison, including lost sales, lost licensing fees, loss of goodwill, harm to reputation, and other harms.

165. Defendant has realized unjust profits and reputational gains and advantages because of its unlawful actions. To the extent its unlawful actions may have ceased, Defendant will still continue to realize unjust profits and reputational gains and advantages by having initially attracted and secured clientele through its unlawful actions and thereafter wrongfully obtained corresponding increases in its goodwill and reputation in the marketplace, increases in its sales of products and services, and increases in its profits.

166. In addition and in the alternative, there is no adequate remedy at law, and Garrison is suffering and will continue to suffer irreparable injury in the absence of equitable relief prohibiting Defendant's unlawful conduct.

### COUNT V
**Violation of the Lanham Act, False Designation of Origin/Unfair Competition
(15 U.S.C. § 1125(a)(1)(A))**

167. Garrison incorporates by reference the allegations set forth in paragraphs 1 through 86 above as if fully restated herein.

168. 15 U.S.C. § 1125(a)(1)(A) prohibits the use of unfair, false, and misleading methods of competition that are likely to cause confusion or mistake as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of their goods, services, or commercial activities by another person.

169. Defendant engaged in false designation of origin and unfair competition by, without permission, misappropriating Garrison's images and other website content depicting Garrison's completed installation projects and superior products, and then presenting them on Defendant's website and marketing media and materials as Defendant's own products and completed installation projects.

170. Defendant engaged in false designation of origin and unfair competition by, among other things, misleading the consuming public to believe that Defendant had sold and installed the depicted products and installation projects, when in truth the shown products and completed installation projects were Garrison's.

171. Defendant engaged in these acts of false designation of origin and unfair competition through one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

172. Defendant's unauthorized uses of images of Garrison's products, work product, and completed installation projects were likely to, and did, confuse or

deceive the consuming public as to the origin, source, sponsorship, or affiliation of the depicted products and services.

173. Defendant's unlawful actions affected interstate commerce by causing false designations of origin to be published on Defendant's website and marketing media and materials accessible to the consuming public, resulting in Defendant's goods and services entering interstate commerce.

174. Defendant's unlawful actions were willful.

175. Defendant's unlawful actions constitute a violation of 15 U.S.C. § 1125(a)(1)(A).

176. Defendant's unlawful actions are the direct and proximate cause of damages and harm to Garrison, including lost sales, lost licensing fees, loss of goodwill, harm to reputation, and other harms.

177. Defendant has realized unjust profits and reputational gains and advantages because of its unlawful actions. To the extent its unlawful actions may have ceased, Defendant will still continue to realize unjust profits and reputational gains and advantages by having initially attracted and secured clientele through its unlawful actions and thereafter wrongfully obtained corresponding increases in its goodwill and reputation in the marketplace, increases in its sales of products and services, and increases in its profits.

178. In addition and in the alternative, there is no adequate remedy at law, and Garrison is suffering and will continue to suffer irreparable injury in the absence of equitable relief prohibiting Defendant's unlawful conduct.

## COUNT VI
### Violation of the Lanham Act, False Advertising/Unfair Competition
### (15 U.S.C. § 1125(a)(1)(B))

179. Garrison incorporates by reference the allegations set forth in paragraphs 1 through 86 above as if fully restated herein.

180. 15 U.S.C. § 1125(a)(1)(B) prohibits the use of unfair, false, and misleading methods of competition.

181. Defendant engaged in false advertising and unfair competition by holding out images of Garrison's products, completed installation projects, trade dress, work product, other website content, and marketing materials as Defendant's own products and completed installation projects.

182. Defendant engaged in false advertising and unfair competition by leading the consuming public to believe that Defendant provided products and services of comparable quality to Garrison, when in reality, the flood control products and installation services offered by Defendant are inferior to Garrison's.

183. Defendant engaged in false advertising and unfair competition by leading the consuming public to believe that Defendant possessed more installation-related knowledge, skill, and experience than it did, and had engineering and

51

construction expertise and installation experience comparable to Garrison's, when Defendant lacked such knowledge, skill, experience, and expertise and was in fact a newcomer to the industry and marketplace.

184. Defendant's advertisements were literally false and misleading to the consuming public.

185. Defendant engaged in these acts of false advertising and unfair competition through one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

186. Defendant's unauthorized uses of images of Garrison's products, installation projects, and work product and materials were likely to, and did, confuse or deceive the consuming public as to the nature, quality, and characteristics of Defendant's products, and Defendant's knowledge, skill, experience, and expertise assessing, engineering, constructing, and installing flood control products.

187. Defendant's unauthorized uses of images of Garrison's products, installation projects, and work product and materials were material to the consuming public's decisions to purchase Defendant's products and services.

188. Defendant's unlawful actions affected interstate commerce by causing false advertisements to be published on Defendant's website and marketing media and materials accessible to the consuming public, resulting in Defendant's goods and services entering interstate commerce.

189. Defendant's unlawful actions were willful.

190. Defendant's unlawful actions constitute a violation of 15 U.S.C. § 1125(a)(1)(B).

191. Defendant's unlawful actions are the direct and proximate cause of damages and harm to Garrison, including lost sales, lost licensing fees, loss of goodwill, harm to reputation, and other harms.

192. Defendant has realized unjust profits and reputational gains and advantages because of its unlawful actions. To the extent its unlawful actions may have ceased, Defendant will still continue to realize unjust profits and reputational gains and advantages by having initially attracted and secured clientele through its unlawful actions and thereafter wrongfully obtained corresponding increases in its goodwill and reputation in the marketplace, increases in its sales of products and services, and increases in its profits.

193. In addition and in the alternative, there is no adequate remedy at law, and Garrison is suffering and will continue to suffer irreparable injury in the absence of equitable relief prohibiting Defendant's unlawful conduct.

### COUNT VII
### Unjust Enrichment
### (Florida common law)

194. Garrison incorporates by reference the allegations set forth in paragraphs 1 through 86 above as if fully restated herein.

195. Garrison conferred benefits on Defendant in the form of Garrison's proprietary website content and work product.

196. Defendant voluntarily accepted and retained the benefits conferred.

197. Defendant misappropriated Garrison's work product, website content and design, and images of Garrison's products and completed installation projects and held them out as Defendant's own.

198. Defendant engaged in unlawful conduct as set forth above.

199. Defendant engaged in unlawful conduct as set forth above through one or more of its agents, while acting in the scope of their agency and authority granted by Defendant.

200. Defendant's unauthorized uses of Garrison's images and other website content were likely to, and did, confuse or deceive the consuming public as to the nature, quality, and characteristics of Defendant's products, and Defendant's knowledge, skill, experience, and expertise assessing, engineering, constructing, and installing flood control products.

201. Defendant's unlawful conduct was likely to, and did, confuse or deceive the consuming public as to the origin, source, sponsorship, or affiliation of the subject products and services.

202. Defendant had knowledge of these unfair and unearned benefits and willfully acted to obtain them.

203. Defendant has realized unjust profits and reputational gains and advantages because of its unlawful actions. To the extent its unlawful actions may have ceased, Defendant will still continue to realize unjust profits and reputational gains and advantages by having initially attracted and secured clientele through its unlawful actions and thereafter wrongfully obtained corresponding increases in its goodwill and reputation in the marketplace, increases in its sales of products and services, and increases in its profits.

204. The circumstances render inequitable Defendant's retention of the benefits conferred.

## COUNT VIII
### Breach of Contract
### (Florida common law)

205. Garrison incorporates by reference the allegations set forth in paragraphs 1 through 86 above as if fully restated herein.

206. Garrison's Terms of Service & Sale are both readily accessible on its website and conspicuous.

207. One or more of Defendant's agents, while acting in the scope of their agency and authority granted by Defendant, visited and reviewed Garrison's website.

208. By visiting and reviewing Garrison's website, Defendant agreed to Garrison's Terms of Service & Sale.

209. In addition and in the alternative, Defendant had constructive knowledge of the Terms of Service & Sale.

210. Defendant is a competitor to Garrison who has its own website.

211. Defendant was reasonably aware that Garrison's website would be subject to terms and conditions, including those against misappropriation of website content.

212. This contract was supported by adequate consideration, including continuing access to Garrison's website.

213. Defendant's unauthorized uses of Garrison's website content as set forth in this Complaint violate Garrison's Terms of Service & Sale on Garrison's website and therefore constitute breaches of contract.

214. As a natural and probable result of Defendant's breaches, Garrison has suffered damages and harm, including lost sales, lost licensing fees, loss of goodwill, harm to reputation, and other harms.

215. Defendant has realized unjust profits and reputational gains and advantages because of its breaches as set forth above. To the extent its breaches may have ceased, Defendant will still continue to realize unjust profits and reputational gains and advantages by having initially attracted and secured clientele through its breaches and thereafter wrongfully obtained corresponding increases in its goodwill

56

and reputation in the marketplace, increases in its sales of products and services, and increases in its profits.

216. In addition and in the alternative, there is no adequate remedy at law, and Garrison is suffering and will continue to suffer irreparable injury in the absence of equitable relief prohibiting Defendant's breaches.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, Garrison, demands judgment in its favor and against Defendant Hydro Dam LLC for all appropriate damages, remedies, and legal and equitable relief available under applicable law, including:

(a)   Awarding Garrison all available compensatory damages, including costs of remedial advertising;

(b)   Awarding Garrison all available multiples or enhancements of damages under governing laws;

(c)   Awarding Garrison its attorneys' fees;

(d)   Permanently enjoining Defendant from:

(i)   infringing Garrison's copyrights;

(ii)   using, advertising, posting, publishing, or displaying Garrison Systems, LLC's photographs, trade dress, trademarks, service marks, copyrighted materials, work product, product designs, images, and any other of Garrison's sales, marketing, or website content or materials;

(iii)   making any false or misleading advertisements or statements regarding Garrison Systems, LLC, its products, or its services, including without limitation any false statements that Garrison Systems, LLC's products or materials are sourced in China, or any false statements that Garrison Systems, LLC's products are designed or perform the same as any other products offered by others; and

(iv)   claiming or suggesting a relationship between Garrison and Defendant;

(e)   Awarding Garrison pre- and post-judgment interest;

(f)   Awarding Garrison restitution in the form of disgorgement by Defendant of all of its profits and other benefits obtained as a result of its unlawful conduct set forth in this Complaint, including the monetary value of Defendant's unfairly increased goodwill and reputation; and

(g)   Awarding Garrison its costs and such other and further relief this Court deems proper, just, and equitable.

## **DEMAND FOR JURY TRIAL**

Garrison demands a trial by jury on all issues so triable.

Dated: May 29, 2026                    Respectfully submitted,

                                       */s/ Callan L. Albritton*
                                       Martin E. Burke
                                         Florida Bar No.: 1015662
                                       Callan L. Albritton
                                         Florida Bar No.: 105688
                                       100 N. Tampa Street, Suite 4100
                                       Tampa, Florida 33602
                                       Telephone: (813) 227-8500
                                       Fax: (813) 229-0134
                                       martin.burke@hklaw.com
                                       cal.albritton@hklaw.com
                                          Secondary: gloria.mcknight@hklaw.com

                                       *Attorneys for Garrison Systems, LLC*